We'll take just a moment until the courtroom settles down. Before you start, if our presiding judge will indulge me, I want to tell you a little bit about what I think about this case and why I think there may be a problem, and hopefully it will sharpen all of your arguments. Seems to me you've got a very fine magistrate judge here, been on the bench a long time, and a very fine district judge, and it looks like they got much of this case correct. Where they disagree, as you all know, is the second R&R entered by the MAG judge, where Judge Land disagreed with him on three issues, as I recall. The one that concerns me the most is this, and it goes to Edwards, who actually was the deputy sheriff who shot the deceased in this case. I've looked at this video three times. I'm a dinosaur when it comes to things like that, so I've got a technician to come up and help me on my computer, and I looked at it frame by frame by frame, and I stopped it all three times. I watched it right before the first shot was fired. Here's what bothers me. I went back and read Edwards' affidavit testimony, where he says, in effect, I saw him raise his hand, the gun come out from behind his back, and then I fired the first shot. That is not what I saw on the video. The video does not show any gun until after the deceased begins to fall, and then there is a gun that falls out to his side, as it looks to me like he's already been shot at because it appears to me he's falling. So we've got, it seems to me, a contradiction here between the video and Edwards' affidavit testimony, and then when we couple that with the other two officers who were present on the scene who also testified that they did not see the deceased pull the gun, they didn't see any gun at all until after he'd been shot. I want somebody to tell me why that doesn't present a classic, genuine issue of material fact, at least as to Edwards, as to why that shouldn't go back for a trial. Thank you for your diligence, Your Honor. Now, I want to sharpen your arguments in this case. This is a very disturbing case, and let me say one more thing before we start you on the clock. The police officer, 99.99% of the time, gets the benefit of the doubt with me. They have to make split-second decisions in dangerous situations. That's why the Supreme Court of the United States created the doctrine of qualified immunity. But it just seems to me, and this is just my initial take on this case, when I watch that video, it seems like the deputy here may have been a little quick on the trigger. Thank you, Your Honor. Again, I appreciate, Your Honor, the amount of time Your Honor has spent on this, obviously. It is one of the major points that we would urge requires reversal of this case. But we don't think it stops there, Your Honor. There are problems with the search here, the seizure, excuse me, not the search, the seizure, was unlawful by jail versus Florida, just establishes, you don't have many cases that come as close as this case does to jail versus Florida. You have the district judge also repeatedly drawing inferences adverse to the non-movement here, the plaintiff in this case. We've cited in the brief, and I'll go over them, there are four or five of them that are- Let me ask you this. They get a telephone call from his nephew, as I remember, says, my uncle's walking down the street, he's waving a gun, he's acting off and mad at his cane or something like that. So they notify somebody to go check the deceased out. But I agree with you, when Edwards and the other officers first arrived on the scene, they didn't see a gun. So the question then, the legal question is, did they have a right to stop him at all? And even if he had a gun, Alabama's an open carry law, I've carried a gun myself for 40 years. I know what the law is about firearms in this state. But based on the prior information they had, and based on the prior problems they'd had with your client, excuse me, the deceased before, would that not be enough for them to stop him? No, sir. They had no prior problems with my client, or Edwards didn't, the other two really didn't know him. Edwards knew this fellow, and his testimony was that he had had 15 or 20 encounters with them previously, and he had never had any kind of violent reaction or interaction with him. He knew of no crimes that he'd been convicted of, other than he said that he thought that there was a, he had heard there was a disorderly conduct. All of this sort of stuff, Judge, is sort of made up after the fact that, oh, we had heard that he had slapped around his mother, we heard he had, you know, there's no criminal charges, they introduced no evidence of any of this. The Edwards simply threw it out there as something to try to make this fellow appear to be a bad man. Your Honor, there isn't any prior history of any significance to the issues here, and that is whether this fellow has a propensity for violence. In fact, Edwards told the ABI agent in the interview that his prior experience with Fletcher Ray Stewart was that he was easygoing. Your Honor, there isn't any past history. This is something drummed up after the fact. The question that Your Honor raised also with regard to the statement that Edwards gave shortly after the shooting where he said that I saw the barrel of the gun start to come up and I, and that's when I fired. Your Honor, it's clear if you look at the ABI interview of Edwards after it, the ABI agent comes back and it is only then that Edwards became aware, oh, I forgot, there's a video of this. I don't get to make it up. He had already gone on record and it made it . . . Those videos don't lie. They do not, Your Honor. And again, this court's jurisprudence is that where there is a video that absolutely contradicts the version of the facts that is given by the witness, then it is the witness's account is to be disregarded in those sort of circumstances. Well, at least it creates a genuine issue of material fact. I believe, Your Honor, and I cited in the brief, I can't cite it right now, but I think that where it is contradicted by the video, then you are to give no weight to the testimony. And I'll try to find that for you when we're up on the break. But Your Honor, the other issues in this case are with the, again, with the seizure itself, Your Honor. I don't disagree that the police, when they got this call and went out there, they had a right to make some inquiry about what's this about. But when they got out there, they didn't see a gun. They didn't see any activity. The magistrate ruled with the . . . Okay. All of these issues. The district court overruled him by drawing inference after inference adverse to the nonmoving in this case, Your Honor. That's one of the issues in the case. The other is the seizure. Your Honor, the only distinctions that the district court attempted to point out, the differences between Florida v. Jail, and I'm sure you all are all familiar with Florida v. Jail, it's that an anonymous tip without more does not give rise to grounds for a Terry stop. Well, how do you . . . Was this an anonymous tip? It is anonymous by every means you can imagine, Your Honor. So the caller didn't identify himself as the nephew of the deceased? Your Honor, he did, but again, that's a little bit of a red herring. Not anonymous. Yes, sir. It is. If you don't . . . You can call up and say, I'm the Count of Monte Cristo, and if you won't, and that's identifying yourself. But there were other things about the tip that also seemed to be corroborated, such as that his behavior, as was reported, was consistent with what the officers who were familiar with him and had previously experienced, that general area where it was to have occurred, that's where they found him, those types of things that went up there. The case law, Your Honor, respectfully, is that simply identifying where he was is not something that lends credibility. Anybody can give a report that I saw Joe Smith . . . That's true. But as I said, there were a number of factors that it seems to me might have corroborated it. I do want you to answer that question. I do have a question coming back to the other issue, but I'll let you answer that question first. All right, sir. I don't know what it is that you, Your Honor, saw that you thought corroborated. All that happened is that they drove out there and they did see Fletcher Ray Smith on Booger Holler Road as he was argued, as they told him. Nothing else that they were told was corroborated. They didn't see a gun out there. They didn't see him doing anything odd or unusual or acting up. There is nothing that it was . . . First of all, the jury said he's raising cane, and I saw him with a gun. Those are the only two incriminatory things, to the extent they can . . . I saw him waving a gun. No, sir. That was not the testimony that . . . The transcript does not . . . That's what the 911 dispatcher told the officer, so that's what the officer knew. The officer had an anonymous tip. I don't know the officer knew that. Okay. You keep saying anonymous tip, but we do have case law in this circuit, in our Holloway case, where we say you've got a 911 call, it's a different situation than an anonymous tip. Ma'am, respectfully, I don't know what telephone line it comes in over is that much of a . . . 911 is an easy number to remember. The police department's number is more difficult. The fact that he happened to dial 911, I don't think should lend it any more credibility than if he had called directly to the police department. Except we have a 911 call about an emergency situation where someone is waving a gun. While you're answering that question, along with it, our case law also, I think, suggests that when you've got . . . not only made through the 911 emergency system, but explains the basis for the tipster's knowledge, like it did here, reports a contemporaneous event, and conveys information about the person that's consistent with law enforcement's experience in dealing with that person. That takes it out of the realm of J.L. I mean, it's not . . . I grant you that it's not the same thing as someone calling and saying, hello, this is Robin Rosendahl, and I'm reporting blah, blah, blah, and giving their name and all of that. But it seems to me that this is not in the same league as J.L. Again, respectfully, Your Honor, I'd like to read . . . this is . . . dispatcher Dowling is the person who took the call. We took her deposition. She testified. She was the only person, of course, to speak with the anonymous . . . the caller, Welch. She didn't know Benny Welch then. She said she doesn't know him today. That was the day of the deposition. She didn't know anything about him. She didn't know if the informant had ever provided any information to the Sheriff's Department before that date. She knew nothing about his identity other than that's who he said he was. She knew nothing about his honesty or reliability or the reliability of the information he gave. She didn't attempt to corroborate any of the information. She simply passed it on, and she passed it on . . . she misstated it when she passed it on. Judge . . . But we're looking at . . . for arguable probable cause here, right? I mean, we're looking for . . . not arguable probable cause, arguable reasonable suspicion. Yes, ma'am, and again, there has to be . . . again, there has to be something alleged about illegality. It isn't simply a tip that comes in that says he's out there selling hotcakes on Porter Hall Road. That's not . . . that doesn't give . . . it has to argue something that . . . it has to relate something that's illegal. Isn't that what the caller did by saying he's . . . when . . . what the officers heard from the 9-1-1 dispatcher was that the man was waving a gun, and that is illegal in an open carry state. You cannot wave a gun. I don't know what waving a gun exactly means. If he was in a crowd of people, possibly so, in a rural road, 15 miles . . . excuse me, 5 miles out of town, I don't know that waving a gun is something that is illegal unless there's somebody there that is being threatened or menaced, and there was nobody. He was alone out there on that roadway at all times. Nobody ever saw anybody in the vicinity. Possession of a gun on a rural road in Alabama, waving it or not, is not illegal. I would submit, Your Honor, and again, you have to be menacing somebody or creating some sort of commotion or disturbing the peace. He's doing none of that. But that's certainly how the officer took it, when the word waving was used. When he went there, he didn't see any of that activity occurring. That should have been the end of it. There's no basis for a Terry stop then. When he got there and saw nothing of the sort that was related in the tip, then he had no basis for making a Terry stop. It's an unlawful seizure, Your Honor, we submit. I want to address one other matter before, because I have to in order to respond to it, because the defense ... One of the arguments is that the other two officers that went along with him, they are also liable under the Jackson versus Saul's case is close to being as on all fours as you can have in that sort of situation. I'd like to take you back to the shooting issue. I agree. I also watched the video and watched it frame by frame, and it seems clear to me, if you're looking at just the video, that the shots occur before you can see the gun in the video. I don't think there's any question about that. If this were based solely on that, I think this would be a very easy case, and it still might be the right ... You might be right, I don't know, but I'm going to tell you what I think complicates this case, and I'd like to ask you to just address it briefly. Part of it you started to address, but it's the officer's prior experience with this individual. As I understand the record, and I'd like you to clarify for me where you think I am mistaken, this officer, Edwards, had been called to deal with Mr. Stewart because he was the one who could best deal with him, because Mr. Stewart, other law enforcement officers had difficulty dealing with him, and Mr. Edwards had a way of being able to keep him calm and deal with him. In the past, he was aware in his prior interactions with Mr. Stewart that Mr. Stewart had engaged in violent conduct, lots of violent conduct. You say that there's no evidence in the record to prove that, and that it's just the officer saying so. I'd like to hear a little bit more about that, because I think that's what makes this a little bit more complicated, because if, in fact, the officer had prior experience dealing with this individual, and this individual was unpredictable and violent in his prior experience in dealing with him, then I don't know whether under the circumstances where this individual is running away from him and then stops and refuses to put his hands up for several seconds and waits to be shot before he can draw his gun. That's what complicates this for me, is the context in which this occurs. Now, I'd like to hear a little bit more about that. I know we're taking you over your time, but we'll give extra time to the other side as well. Your Honor, the testimony that Mr. Edwards gave, Your Honor, was that he had never had any kind of violent ... He'd never witnessed any violent encounters between himself and Mr. Stewart, nor violent encounters with any other police officers and Mr. Stewart. There was ... He knew of no criminal offenses. Again, there's ... He denied any knowledge of any firsthand knowledge. He said what he had heard is that he had, on other occasions, there had been these kind of things. I'm looking for the ... I have my ... Something involving chains and beatings. Yes, ma'am. That in particular, he said he knew nothing about that. That occurred supposedly before Davis ever came on the ... Edwards ever came on the force. He had heard that about the bicycle chains, about beating his mother. He went out there on that call and he said, I didn't see anything except he was out there by the shed. We didn't see any of that that occurred. Your Honor, the testimony is very, very clear. I'm disappointed I can't find the citations I could give them to you. He repeatedly denied any knowledge, direct knowledge, of any kind of prior violent activity between Edwards and Davis, the shooter. Can we not consider his knowledge that he received from other people? It would be hearsay and it would be opening the door to ... Why is it hearsay if it's what he's ... If it's not for the truth of the matter but rather for what Officer Edwards believed at the time, why would that be hearsay? Well, it is ... He took it as being true and it also is too easy to invent, Your Honor, in these sort of situations where the police officer who shoots somebody and is claimed to have done it wrongfully, where he has no prior knowledge, direct knowledge that he can claim of this person acting violently. He has licensed them to ... I had heard that he had beat up three other people in another county one night, that he had pulled a gun and shot up a bar in Phoenix City, that he had ... It was pulled over for speeding outside of Montgomery and took the flashlight away from a cop. Your Honor, there was no evidence in the record to support any kind of criminal activity. If these things that they claim had occurred, there would have at least been arrests, if not convictions of these things. Thank you. They offered nothing. Thank you very much, Mr. Six. You've reserved five minutes for rebuttal. Mr. Clements. Let's give Mr. Clements ... Well, how about if we give you five minutes and we'll give Ms. Carter another two. I think that will even things out a bit. Thank you, Your Honor. May it please the Court, my name is Fred Clements. I represent Deputy Brian Edwards. I'll begin by attempting to address Judge Divena's question regarding the fact that regarding the firing. First of all, do you dispute my characterization of the video? No, but it will take a little bit of explaining. Because I agree with you to the extent that the video does not show the gun in his hand until after the first shot is fired. However, the video does not confirm or deny whether or not Edwards was able to see the gun in his hand at the time he shot. And to explain, first, Edwards' affidavit recalls his recollection of how it went there. He remembers seeing the gun in this rapidly evolving situation. That's what he recalls seeing the gun. But wouldn't you agree with me that when you read his affidavit testimony very carefully, it contradicts what we see in the video? No, Your Honor. And I ... Why not? The ... a forensic ... an expert in video forensics. Because one of the things that we were unable to tell is when was the shot fired? And it had to do with the sound, for one. Wasn't synced. But to the point, how the forensics expert determined when the first shot occurred was by freezing frame by frame. And you can tell the first shot because the slide on Deputy Edwards' pistol comes back at that time. That's a Glock or a Beretta? What was it? I believe it was a Glock. Yes, Your Honor. So when the slide came back, at that moment, Deputy Edwards' camera was at chest level. So it was at times obscured by his arms. And the shot at that point, due to the movement, we can't see Edwards' ... excuse me, Fletcher's arms. And the shot causes his ... excuse me ... causes his arms to come up, which again blocks the view of the video. Now, what he was able to determine is that picture. And we made sure to note this in the brief so as not to attempt to deceive. But the picture with Fletcher, with the pistol in his hand, was taken around a half second after Deputy Edwards fired that first shot. But unfortunately, the video does not capture what was occurring in Deputy Edwards' line of vision when he fired the first shot. But in light of that, as Judge Dubina has asked, why doesn't that not create at least a material issue of fact on that issue? Well, it doesn't create a genuine issue of material fact because Judge Land's opinion presumes that Deputy Edwards did not see the gun before he fired the first shot, which is why- Yeah, I think that's where I disagree with Judge Land. What case can you give us where a situation like this has occurred where a police officer shoots and uses deadly force against someone that he doesn't see has any weapon on him at all? Have you got a case that says that? That you can use deadly force against a person? I can shoot you right now because I think you've got a gun on you. Is there a case out there that says that? You're asking is there a case- That says you can use deadly- I'm sorry, Your Honor. No, go ahead. That an officer can use deadly force because he thinks somebody has a gun? No. But there are cases to support use of force if there is probable cause to believe that there is a dangerous threat. And what we had in this case is that to go back to the beginning of the stop, we have the report from the dispatcher that he was waving around a pistol. When Deputy Edwards arrives on the scene, he says Fletcher at first turns in the other direction, and then he flees into the woods. Now, one of the things that's important about his previous dealings with Fletcher is Deputy knows that he is potentially violent and ill-tempered. But also their previous interactions, Deputy Edwards was able to reason with him and talk him down. And so while Fletcher may have had other issues with law enforcement, he didn't have it with Edwards. And so the fact- And so Edwards even testified at deposition is that he didn't have any reason to run from him. And Deputy surprise is captured contemporaneously on the radio traffic when he states, is he running from me? It not only records that he was running, but it records his surprise. And then when we get to the scene, the situation itself into the woods where Deputy Edwards hasn't show his hands. And he asks, he says to show his hands, which he does. Deputy Edwards also asks him to turn and face the other direction, which Fletcher does not do. He then says, tell me where the gun is, which Fletcher doesn't respond. There's no response. I don't have a gun or it's a BB, it's a BB pistol. He says nothing. And instead, despite orders to show your hands, show your hands, he proceeds to quickly reach behind his back into the area around his right pocket. And under those circumstances, it was a situation where had he had a pistol there, he could have within seconds fired it at Edwards and the other officers. And in fact, the video shows it would have been, it would have been less than a half a second that he could have had the gun out. But what you left out of the equation is, is that the time he reaches his hand behind his back, Edwards has got his block pointed right at his chest. And the minute that hand starts coming around behind his back, I would agree with you. He can use deadly force and shoot to kill. The minute that hand moves, my problem is when I watched that video, I didn't see the hand move on the deceased. I agree with you. If he saw the hands even come around and not seen a gun in the hand, but just seen his hand come around, I would say deadly force, okay. But that's not what the it is. It is perhaps a fact question. Although if you, if you look at the forensic, if you have to look at it slide by slide to see if I did that, look at, look at, then look at Fletcher Stewart's coat. See, because the video, as he's moving around, the video is shaking. What indicates the movement is that his coat goes from a position like this to like this. You can't see the arm, but the movement of the coat that he has indicates a backward movement. Let me ask you, let me ask you this question. Where were the other two officers positioned in relation to Edwards? Because I understand both of them testified they did not see a gun. That is correct. They testified that they standing right to the side of Edwards or they all had their guns drawn. I believe that one of the municipal officers was approximately five feet to Edwards' right and the other officer was approximately five feet to that officer's right. First one that would have seen would have been the one to the left because the hand that reached around that had the gun in it was the deceased's right hand, correct? Edwards would have been in the best position to see where Fletcher Stewart's right hand would have been. Well, I think the officer to his left would be the best. Well, those officers were to the left, were more to Fletcher Stewart's left side. Edwards was more to Fletcher Stewart's right side. But when he fell and the gun, you see the gun for the first time in the video, was it not in the deceased's right hand? Yes, Your Honor. And so that looking, so Edwards would have been to the right and then we would have had a municipal officer here and a municipal officer over here. And both of them testified, but now both of them did testify although they didn't see the gun, they did see this movement. So, if there was a case that I could cite to, it would be Shaw versus City of Selma, which in that case, officers shot a 70-year-old mentally ill man who had a hatchet. Now, it was recorded on a video as well and like this case, it didn't capture everything. Shortly and during the shooting, the man's arm and hatchet was out of view of the camera. The estate argued that there was a genuine issue of material fact as to whether he was in an attacking position. And what this court said is it didn't matter because he, although he was he could have raised the axe and attacked. So, it didn't matter whether he was holding the axe down above his head or behind his back because officers are not required to wait until the person uses force in order to take steps to protect himself. I agree with you a thousand percent on that. And well, also we have the situation. I'm sure that's the situation we have in this case. It is different except this in this instance because we're using, we're dealing with a firearm and not a hatchet. While that individual may have been able to use that in seconds, we're talking, these were milliseconds and milliseconds that Deputy Edwards had to make a decision about life or death. The fact that he believed that there was a pistol is represented on the video because he directly asks him where the pistol was. And the facts and there were facts that supported belief that he could have had a pistol and the movement which was indicative of someone that could be grabbing for a pistol which could be shot has taken place. It's only half of a, it's less than a half of a second before that gun is there. Except that, except that if the reason the gun is there is because he's falling and he's just reaching out his arms. I'm not sure that necessarily tells us anything. If it's, one, it tells us the gun's in his hand. Two, it tells us that if he has, if he has fallen within that be pulling it out with intent with that amount of time. Let me ask you something. Did you want to address Mr. Edwards' knowledge of Mr. Stewart, the types of questions that I asked Mr. Sykes? That is, is it, is it your client's position that any of his prior knowledge of his dealings with Mr. Stewart and those of his colleagues' dealings with Mr. Stewart in any way had, have any bearing on how we should look at this? Well, yes, albeit Edwards' testimony was not really as represented. Now what Edwards testified to is that he personally had not had any trouble, unlike some other officers, in dealing with Fletcher Stewart, hence some of the surprise when he had run. Additionally, he went out there on numerous calls, including one where Fletcher Stewart held a neighbor down with a taser so that it burned her. He also was there when Fletcher Stewart had picked up a large cinder block. Apparently he was a strong individual and was threatening to hit another police officer with it. I believe crush his skull is what he said. And Deputy Edwards had been able to calm him down and talk him out of it. Deputy Edwards had come across a situation where Fletcher Stewart was fighting with security at a hospital and he was able to, again, talk him down and actually on that occasion took him home. And so, yes, they had a decent enough relationship that Edwards felt like he could talk to him and calm him down. But no, it is incorrect to say that he did not have knowledge of other instances of him being violent. But let me ask you sort of a more fundamental question, which is, do you think his knowledge, Officer Edwards's knowledge, has any bearing on how we analyze what happened in the shooting? Yes. Yes. And I would like to go back to the incident of involving police officers telling him, Edwards, about Fletcher beating another officer with a bicycle chain. And apparently he was hospitalized. Now, I would point out that in the Shaw v. City of Selma case, one of the factors that they took into consideration in the use of force is the shooting officer was told, the man will fight you in a minute. In another case, Williams v. Deal, this involved an officer who actually knew the individual and they ended up getting, he pulled them over for a traffic accident, they struggled, there was a shooting. What this court took into consideration, the officer, there was an additional use of force claim in addition to the shooting itself because when Deal attempted to get out of the car, the officer forcefully put him back into the car. What the court took into consideration was this officer's personal knowledge, what he had been told that he had known that he had been beaten his girlfriend, that there was another officer that he'd had an altercation with, he had been told of a report that said if that officer shows up again, it'd be the last time he shows up. These were factors that this court took into consideration, the officer's personal knowledge, which should be taken into consideration because officers have to act on this every day. You know, what they know about this particular individual. Let me ask one last question. There's some evidence in the record that the deceased suffered from some mild retardation. What level of retardation did he have? Yeah, the record's never really been established on that. Apparently, he was never diagnosed. I believe one of his relatives testified that he was, you know, to quote, retarded. Deputy Edwards. There's no medical expert testimony to that? To what his precise condition was? No. Okay, thank you. Thank you, Mr. Clements. We'll hear from Ms. Carter. Thank you, May it please the court. I'm Elizabeth Carter and I represent Deputy, I mean, I represent Officers Rico Hardnett and Officer Christopher Finn, who responded to a call to provide backup to Deputy Edwards. The, you know, to get straight to it, and then I'll answer your questions if you have any, to speak directly to what Mr. Sykes said. The question in this case for our office, for these officers, is whether their conduct at the time was clearly established in the law as unconstitutional. It's undisputed, and the plaintiff's counsel has conceded this, that it was fine for them to respond to a call for backup. That's their job. It is undisputed that they knew it was Deputy Edwards responding to a call about Fletcher Stewart and that Fletcher supposedly had a gun. Of course, they'd not seen it yet, they didn't know that for sure, but that's what their information was. It's undisputed that when they got there, and it's on video, there's contemporaneous conversation, Fletcher is running into the woods, he's running from Edwards, and Edwards is going into the woods behind him with his gun drawn. So, these two officers followed in with their guns drawn, which is what they would have been taught to do, which would have been reasonable under the circumstances, and there's no case in the circuit or the U.S. Supreme Court that said they could not. They never made any commands, they never told him anything to do, they did not fire a shot. They did witness the movement of his arm moving behind his back. I will say, just for point of clarity for everybody here, it's my understanding that these two officers were on the right side of Deputy Edwards, so he was actually on the side where he would have seen the gun first, regardless. They did testify that they didn't see the gun, but that he made a quick motion behind his back. Plans Council argued to the court that Jackson Salls was, I think he said, basically on all fours here. He also argued three or four other cases would give us clearly established law notice, which I can address if the court would like for me to, but I'll speak to Salls specifically since he did. Real quickly in Salls, that's the case where an undercover police officer sees some guys in a blue Pontiac and wonder what they're up to. They think maybe they're other police officers or something. When they realize they're not, they say they were going to go about their way, but this blue Pontiac pulls in by a dumpster at a mechanic's shop, and these police officers decide to go check it out because they've decided that the guys are acting funny in the car and that Pontiacs are easy to steal. They get there, check out the car, nothing about the car indicates that it has been broken into or any problem, but they enter the mechanic's shop anyway, guns drawn, screaming, yelling obscenities, telling everybody to get on the floor, and the people who were doing nothing wrong in there think they're being robbed and shoot at them. In that case, the officer who, and of course the officer shot back. In that case, the officer who didn't hit the plaintiff, who was not the shooter, said I should get qualified immunity because I didn't hit the shooter. And the 11th Circuit, I think rightfully so, said that was an orchestrated effort. You were a part of what was going on. You made the decision with the police officers in the car. You went in and you participated in that action when there was to what these two officers did in the circumstances is, there is no comparison. And it is our position that the magistrate judge found correctly that there was no case or statute that would have provided notice to our officers that they could not go provide that backup. Ask you this question. Should we draw anything in this case from the fact that Edwards fired and your two clients didn't? Respectfully, no. I think that stopping a video and watching it over and over again, which is what we've had to do in this case and others, is the very thing that qualified immunity protects. I think that what Edwards saw from his perspective in a split second, when he was the person with the most experience with Fletcher, Fletcher had always been responsive to him. I do not think he had, that Edwards had to wait to be shot at to shoot back. He didn't go out there to shoot anybody. These two officers didn't. And I think the fact that they didn't see the gun until, I think it was when it dropped or certainly after the shot was fired, speaks nothing to the protection that should be provided to Edwards in the moment he had to make that decision. I think that these officers were very clear. What is very telling to me in this case, and it's a very sad case, obviously it was tragic. He was not mentally, he was not, he had disability. We don't know what extent. But it was a BB gun, not a gun. It's definitely one of the cases that makes you sick to your stomach. We've got cases in our circuit where I can remember one I sat on years ago where a water pistol was involved. So the fact it was a BB gun really doesn't figure in with the equation. It still makes you sick. But I think it is so telling that all three of these individuals had some level of knowledge, Brian Edwards a lot, and had been able to deal with him. And as sad as it is, I do not think that there is any law that requires him to have actually seen the gun before he shot. I think that probably all happened so fast. I think he was shocked about the way Fletcher was probably acting. I think the officers were surprised that he was just not being compliant. I think the fact that he fled and the information they had about him takes it for Edwards. And of course for our officers, just to be perfectly blunt, I can't imagine what the law would be if they were told they could be held responsible for what happening by simply providing another officer back up. If y'all have any other questions, I'm happy to address the other case law. But we would take the position that the issue for our officers is clear and ask that you affirm the summary judgment that was granted. Thank you, Ms. Carter. I want to first address the questions with regard to the other incidents that were testified to. In Edwards' brief, they say four incidents, discharging a taser at a neighbor, fighting with hospital personnel, beating a police officer with a bicycle chain, and assaulting his own mother. Those are the four they put in their brief. Here's the testimony, and I'll give you the deposition page numbers from Edwards, and I'll give you the quote from Edwards out of his deposition testimony. Regarding the taser incident, Edwards testified, I didn't see it occur. That's at page 74 of his deposition. The record is 92-1-page 74. With regard to the alleged fighting with hospital personnel, Edwards testified that he, quote, didn't see any of the incident at the hospital. That's at page 70 and 71 of his deposition. Regarding the alleged assault on his mother, Edwards testified he did not witness it. He said, quote, the only thing I saw when I got there, he, Stewart, was they have a shed out by the house where he worked on a bike. He was out there working on it. Edwards said he, quote, never saw anything other than Stewart fiddling with his bicycle on that occasion. That's page 76 and 77 of his deposition. Regarding the bicycle chain incident, Edwards testified he didn't see it because, quote, that incident was before I started working there. He's talking about it at the Sheriff's Department. That's at page 112 of Edwards' deposition. Edwards had no knowledge of He can be obscreporious when he was crossed, but that's what all of this is about. They tried to make the fact that the guy could get unruly and obscreporious, but there's not any evidence of this guy ever being violent before. This case also, the circumstance in this case that distinguishes it from other unlawful excessive use of force cases, in my opinion, also is a rare and unique, I would say novel situation. I didn't find, in my review of the case law, I didn't find a single case reported where the shooter knew the person he shot. We have that circumstance here. That removes a great deal of the uncertainty that a police officer has when he walks up after making a police stop on a speeding ticket, walks up to that window. See, except that in this case, the argument that they're making is that actually contributes to the uncertainty. I mean, that's the argument they're making. The argument they make has no basis, Your Honor. There are no facts that indicate that these officers or this officer... Except that this officer doesn't have to have personally experienced it if he believes that these things have occurred. And if somebody, if a fellow officer, even if it happened before he joined the squad, wound up in the hospital as a result of something that Mr. Edwards thinks happened, right? I'll agree with you, Your Honor, except that this officer had had 15 or 20 encounters with the subject, Edwards, and never had any indication of violence. No, I understand that. And I think, let me just say this, because I'll tell you, I think this is a very, very hard case. I mean, as I said before, when you look at the video, I think if you look at the video in a vacuum, this is a big problem, and it's a much easier case. But when you consider the context, that's what makes it challenging. So let me do this, if you don't mind. Let me make what I think is the best argument for the officers, and you tell me what's wrong with it. And I'm not saying that this is necessarily, in my view, a winning argument, but it would help me to hear what you is wrong with it. The argument would be that based on Edwards' knowledge of this particular individual, Mr. Stewart, not only from his own dealings, but also from his collective knowledge, I guess, of what he learned from his fellow officers, and his belief that this sometimes in his behavior, and had been violent in other incidents with police. And in view of the fact that when he arrives at the scene, he's chasing this individual, Mr. Stewart, and Mr. Stewart is not responding to his commands. He finally does stop. He's told to put his hands up where they can be seen. And he does that, but then he later puts them behind his back, and isn't following instructions at all at that point. Under these circumstances, where the officer has reason to believe that there is a gun that's involved, where the individual who he's previously dealt with on all of these other occasions, and has found to be able to deal with him, but now he can't deal with him, and he has this other gun, why is it not arguably permissible for him here? Why would a reasonable officer in that particular position not have been able to make the shot under those circumstances? Your Honor, Rob brings a lot of things to unpack there, but there's answers to all of them. But I can remember all of what you ran through a number of things. I'm sorry, I'm trying to... I'm not finding fault, Your Honor. No, that's all right. His own personal knowledge over a couple of years after he did join the force should outweigh whatever scuttlebutt there may have been about these prior incidents. The 15 or 20 incidents where he did interact... Just assume, for purposes of my question, that he is allowed to consider this prior information he has from other people. There's a credibility issue there, Your Honor. I understand what your position is on that, because we've discussed it before. But let's just assume that he's allowed to... I mean, are you saying that if he is allowed to assume this, then the shooting was one that a reasonable officer might have done? Or are you saying that even if he's allowed to, even if we assume this, that it's still not something that a reasonable officer could have done? That would be very helpful to me to know. I don't think it's reasonable under either circumstance. Okay, so can you speak to the second situation where he is allowed to assume these things, and he does, in fact, believe and assume them, and he's still not allowed to take the shot? In no prior instance was there any gun involved. There was a bicycle chain and a, I don't know... A taser, a cinder block. Yeah, yeah. There's not even a knife. I mean, there's no weapon involved. This is a guy who can be fractious if he's crossed in a way, and Edwards knew that. This is the thing that distinguishes it from the other cases, Your Honor, is that they knew this guy and knew him not to be violent. That is what they knew from, or Edwards knew from his prior experience. Never had any violent encounter with him. All of this other stuff that he'd heard about, that had occurred five and 10 and 15 years ago, it should be outweighed. We look at the totality of the circumstances. So you're saying that we have to look at whether or not... We have to decide whether or not this shooting was something a reasonable officer would have done. We need to look at whether it was reasonable for Officer Edwards to believe what his fellow officers said. Is that what you're saying? I say that's a jury issue, Your Honor. This is a question that is classically what juries decide. But I guess I want to ask you, let's just assume that it was reasonable for him to but assume that it was reasonable for the officer to accept... So he's tried these prior incidents that occurred. Is that what you're saying? Yes, and that he viewed them as showing violent tendencies. Just assume that for purposes of this hypothetical. Was the shooting then reasonable? No, it was not. Okay, and that's what I need to know the answer to. The reason why it wasn't, Your Honor, is again, they have pieced together over a period of... These incidents they're talking about went back five and ten years or so. They're talking about the hospital incident, to the extent there was one, whatever when they got called out about his mother. You're talking about something five and six and eight years ago. You're talking about a scattering of things that a herd had occurred. When that's weighed against what this guy himself personally knew about him, interacting with him 15 or 20 times, that greatly outweighs. He knows him in a way that you can't know him from hearing something around the police locker room about Edward, about Stewart. What Edward knew about him was that he had never been violent with him. He'd never raised a hand to him. He'd never threatened him. He'd never known him to possess a weapon. He'd never known him or seen him to harm anyone. Your Honor, that is what I'm saying, is that even if you factor in and let Edward accept that these scattered events over the 10 or 12 year period they occurred were accurate. His own personal experience within the last two or three years, or one or two years even, where he never exhibited any of these kind of tendencies outweighs that. Your Honor, he has never seen a gun. When Edward fires the gun, fires at him, he doesn't know whether he is armed or not. Again, the standard is there has to be an articulable reason to believe he was armed. They had none. Your Honor, read Judge Barkett's dissent that I put in my brief. She characterizes it just absolutely to a T. Somebody calls up and identifies I'm the Count of Monte Cristo, or I'm Benny Welch. I'm his cousin. The police officer who hears it knows none of this. She doesn't know whether that's true or not. She testified that's the only way that he was identified. He gave a name on the audio itself. The dispatcher dowling. She doesn't even know. She says Benny Welch. I think we have to argument. Thank you very much, Mr. Sykes. We'll be in recess.